# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DEBRA CHERKAOUI,

   Plaintiff,

 v.            Civil Action No. 14-cv-10571-LTS

CITY OF QUINCY,

    Defendant.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. No. 60)

CABELL, U.S.M.J.:

 Debra Cherkaoui ("the plaintiff"), worked for several years as a public school teacher for the City of Quincy ("the defendant").  She has brought several claims alleging that she was discriminated and retaliated against, and ultimately forced to quit, because she is Muslim and suffers from Attention Deficit Hyperactivity Disorder ("ADHD").  The defendant has moved for summary judgment on all claims.  (Dkt. No. 60).  For the reasons discussed below, I recommend that the motion for summary judgment be allowed.

## I.  RELEVANT FACTUAL BACKGROUND[1]

 In or around 1998, the defendant hired the plaintiff as a public school teacher.  (Statement of Material Facts in Support of Defendant's Motion for Summary Judgment ("Quincy SOF"), at ¶ 8).  (Dkt. No. 62).  Except for a relatively brief interruption when her child was born, the plaintiff worked part-time at the Atlantic Middle School ("Atlantic") between 1998 and 2009.  The plaintiff

---

[1] The facts are undisputed unless otherwise noted, and are set out in the light most favorable to the plaintiff as the non-moving party.  *See DeNovellis v. Shalala*, 124 F.3d 298, 302 (1st Cir. 1997).

taught Spanish and English Language Learners ("ELL"), and regularly received positive performance evaluations.  (Quincy SOF, at ¶¶ 9-10).

The plaintiff is Muslim.  In April of 2009 she began to wear a headscarf to work for religious reasons.  (Quincy SOF, at ¶ 11; Cherkaoui's Statement of Disputed Facts ("Plaintiff's SOF"), at ¶ 10).[2]  The plaintiff alleges that after she began wearing the headscarf the defendant began to discriminate against her by treating her discourteously, treating her differently than other similarly situated teachers, giving her inappropriate or impractical assignments, and failing to respond satisfactorily when she complained.  The plaintiff also suffers from ADHD and alleges that the city failed to appropriately respond to her requests for some accommodation.  More particularly, the plaintiff alleges as follows.

1. The 2009 – 2010 School Year

a. *Split Assignment, Inadequate Notice of Assignment, and Lack of a Classroom*

In the spring of 2009 the plaintiff was teaching part time.  She requested a full-time teaching assignment for the 2009-2010 school year and the defendant granted her request.  (Quincy SOF, at ¶ 13).  To effect the transition, the plaintiff was required to split her time between two schools, Atlantic and the Sterling Middle School ("Sterling").  (Quincy SOF, at ¶ 14).  This was the first time the plaintiff ever had to teach classes at two different schools.  (Plaintiff's SOF, at ¶ 11).  According to the plaintiff, split assignments are disfavored and uncommon.  (Plaintiff's SOF, at ¶¶ 12-13).

When the plaintiff first received her assignment for the 2009-2010 school year, she was told that she would be teaching three ELL classes at Atlantic and two at Sterling.  A few days before the first day of school, however, she was told that instead of three ELL classes at Atlantic,

---

[2] The plaintiff avers that she never wore a headscarf to work prior to April 2009 but the defendant contends that she admitted to wearing it at least once prior to then.  See Plaintiff's SOF, at ¶ 6; Quincy SOF, at ¶ 11.

she would be teaching two ELL classes and one Spanish class there.  (Plaintiff's SOF, at ¶ 14).

This last minute change of assignment was disadvantageous, and it was "extraordinary" for

teachers to not be given their school assignments the previous June.  (Plaintiff's SOF, at ¶ 15).

Despite the change in her assignment, the plaintiff began teaching her split assignment for that

year.

The plaintiff was not assigned to a classroom at Sterling.  Instead, the school Principal,

Christine Barrett ("Barrett") offered her a section of the library called the media center.  (Plaintiff's

SOF, at ¶¶ 18-19).  The media center did not have a teacher's desk and there was nowhere for the

plaintiff to store her materials.  (Plaintiff's SOF, at ¶ 19).  Principal Barrett subsequently offered

the plaintiff a classroom that was used by the special education teacher.  According to the plaintiff,

no other teacher had ever been assigned to teach in that room and no other teachers were required

to teach anywhere other than a regular classroom.  (Plaintiff's SOF, at ¶¶ 20-21).  The plaintiff

completed the 2009-2010 school year splitting her time between Atlantic and Sterling.

b.  *Disciplined for being Tardy*

The plaintiff was not given enough time to get from Atlantic to Sterling and consequently

was sanctioned for being tardy.  The plaintiff received oral reprimands, three written warnings,

and ultimately a suspension.  (Quincy SOF, at ¶¶ 24-31).  The plaintiff's union advised her that

the amount of time the defendant gave her to travel between the schools, prepare for class, and eat

lunch was insufficient and in violation of the union contract.  (Plaintiff's SOF, at ¶ 22).  On October

1, 2009, the plaintiff complained and the defendant gave her an additional 10 minutes to travel

from Atlantic to Sterling.  (Plaintiff's SOF, at ¶ 27).  Despite the extra time, though, the plaintiff

was late again on at least one other occasion.  (Plaintiff's SOF, at ¶ 30).  Because she had

previously received oral warnings, Principal Barrett sent her a written warning, on November 17,

2009.  (Plaintiff's SOF, at ¶ 32).  On or about the same day, the plaintiff met with Principal Barrett to discuss the written warning.  The plaintiff's recollection of the meeting differs from that of the defendant.  According to the plaintiff, she asked Principal Barrett if she was being disciplined and treated in a hostile manner because she was wearing a headscarf.  (Plaintiff's SOF, at ¶ 32). According to Principal Barrett, the assistant principal, and another teacher who were all present at the meeting, the plaintiff displayed inappropriate and hostile behavior toward Principal Barrett. The plaintiff accused Principal Barret of being a racist and left the meeting before it ended. (Quincy SOF, at ¶ 25).

The plaintiff received a second written warning on November 18, 2009.  This warning referenced her behavior at the meeting and reminded her again that she had been warned about her repeated tardiness.  (Plaintiff's SOF, at ¶ 34; Quincy SOF, at ¶ 26).  The plaintiff denies ever being late again but the defendant contends that the plaintiff continued to be tardy and therefore received another written warning on December 3, 2009.  (Plaintiff's SOF, at ¶ 37; Quincy SOF, at ¶ 27).  In response, the plaintiff left the school to speak with Superintendent Richard DeCristofaro ("DeCristofaro"), and then went home for the day because she was upset.  (Plaintiff's SOF, at ¶¶ 39-40; Quincy SOF, at ¶ 28).  The defendant sent the plaintiff a notice of intent to suspend her on December 22, 2009.  The plaintiff was given the opportunity to discuss the planned suspension with Superintendent DeCristofaro but she failed to attend the meeting and then did not return to work after December 22, 2009.  (Plaintiff's SOF, at ¶ 41-42; Quincy SOF, at ¶¶ 29-30).

On December 23, 2009, the plaintiff sent an email to the Director of Human Resources, Kevin Mulvey ("Mulvey"), stating that she suffered from ADHD and wanted to learn what accommodations could be made to address it. (Plaintiff's SOF, at ¶ 43; Ex. M).

On January 7, 2010, and while the plaintiff was out ostensibly on sick leave, the defendant sent her a letter suspending her for three days due to her "consistent tardiness and inappropriate conduct." (Quincy SOF, at ¶ 31; Ex. 15). On January 9, 2010, the plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging religious discrimination and retaliation. (Plaintiff's SOF, at ¶ 46; Quincy SOF, at ¶ 32, Ex. 40).

c.   *The Defendant's Use of an Independent Medical Examiner*

The plaintiff did not return to work after her suspension and remained on sick leave for the rest of the 2009-2010 school year, reportedly because of her ADHD. (Quincy SOF, at ¶ 35). The union president told the plaintiff about a sick bank fund available to employees who have used all of their accrued sick time but are still unable to return to work. (Plaintiff's SOF, at ¶ 47). The union president explained that the defendant had the right to order the plaintiff to submit to an examination if the plaintiff sought paid sick leave. (Plaintiff's SOF, at ¶ 47). The plaintiff subsequently did seek paid sick leave and the defendant did exercise its right to have her undergo an independent medical exam ("IME") to confirm her eligibility. (Plaintiff's SOF, at ¶ 48; Quincy SOF, at ¶ 36). The plaintiff underwent the IME and was deemed unable to work, and was granted sick bank benefits retroactive to the date of her request. (Plaintiff's SOF, at ¶ 50; Quincy SOF, at ¶ 38). The plaintiff believed that the defendant required the IME in retaliation for her filing a charge with the EEOC, and she amended her EEOC charge to include an additional claim of discriminatory retaliation.

2.   2010-2011 School Year

a.   *Failure to Accommodate Disability and Discriminatory Treatment*

In the summer of 2010, the plaintiff informed the defendant that she was ready to return to work for the upcoming 2010-2011 school year, and she sent Mulvey a written request for

accommodations for her ADHD.  (Plaintiff's SOF, at ¶ 51; Quincy SOF, at ¶ 39, Ex. 21).  The letter requested that the plaintiff: (1) be limited to teaching at one school; (2) be provided with the names and content of her course assignments one month before the start of the school year; (3) be given an opportunity to meet with her supervisor before the school year began to establish clear lines of communication; and (4) be given 24 hour advance notice of any meetings other than ordinary teaching related meetings to which all teachers are subject.  (Quincy SOF, at ¶ 39, Ex. 21; Plaintiff's SOF, at ¶ 51).

The defendant contends that it granted all of these requests except the request for 24 hours' notice of any meeting, because that was not always possible.  (Quincy SOF, at ¶ 39).  The plaintiff acknowledges that she was given a full-time ELL teaching assignment at Atlantic but contends the defendant did not give her the most important accommodation she requested, clear lines of communication with her supervisor.  (Plaintiff's SOF, at ¶¶ 52, 55).

The 2010-2011 school year was essentially incident free, except that the plaintiff contends she was required to undergo another medical examination before being allowed to return to work, was ordered to sit in a conference room for one hour before being allowed to go to her classroom on the first day of school, and was being watched by a co-worker named Elizabeth Angell ("Angell") who falsely alleged that the plaintiff was not in her classroom when she was supposed to be. (Quincy SOF, at ¶ 41; Plaintiff' SOF, at ¶¶ 53-59).

3.  2011-2012 School Year

a.  *Assignment to Teach ELL Science*

At some point before the plaintiff began teaching ELL at Atlantic, the defendant decided to have teachers incorporate a "content area" of either math, science, or social studies into their ELL curriculum.  (Plaintiff's SOF, at ¶ 60).  Initially, the plaintiff was assigned to teach ELL social

studies. (Plaintiff's SOF, at ¶ 61). As the 2010-2011 school year came to an end, however, the plaintiff was informed in June of 2011 that she was being assigned to teach ELL science for the following 2011-2012 school year, despite the fact that she had previously indicated she would never want to teach science. (Plaintiff's SOF, at ¶¶ 62-63). When the plaintiff informed the Principal of Atlantic, Maureen MacNeil ("MacNeil"), that she was not comfortable teaching science because she did not have a background in science, MacNeil allegedly told the plaintiff she could "take it or leave it." (Plaintiff's SOF, at ¶ 63). The plaintiff taught ELL science for the 2011-2012 school year. (Plaintiff's SOF, at ¶ 65).

At the end of the 2011-2012 school year Angell, her co-worker, sent the plaintiff a letter expressing concerns about the plaintiff's job performance. (Quincy SOF, at ¶¶ 41-42, Ex. 24). On June 17, 2012, the plaintiff sent MacNeil a letter complaining about Angell's letter. (Plaintiff's SOF, at ¶ 80, Ex. Q). As the school year was nearing its end, MacNeil decided to address the plaintiff's concerns at the beginning of the following school year.

4. <u>2012-2013 School Year</u>

    *a. Claims of Harassment*

Principal MacNeil met with Angell in September of 2012 to advise her that it was inappropriate to send a letter such as the one she had sent to the plaintiff, and told her that any personnel conflicts should be addressed through her. (Quincy SOF, at ¶ 44). MacNeil also met with the plaintiff to address the issues raised both in Angell's letter to the plaintiff, and in the plaintiff's June 17, 2012 letter to MacNeil. (Plaintiff's SOF, at ¶ 86). During the meeting, the plaintiff did not allege any harassment or different treatment on the basis of religion or disability by Angell or anyone else, but instead reiterated her request for open lines of communication with MacNeil. (Plaintiff's SOF, at ¶ 86; Quincy SOF, at ¶ 45). Specifically, the plaintiff asked not to

receive any information through Angell.  Principal MacNeil agreed.  (Plaintiff's SOF, at ¶ 86).  In December of 2012 Angell transferred departments and no longer worked with the plaintiff. (Quincy SOF, at ¶¶ 47-48).

In January 2013, however, the plaintiff began having problems with a different co-worker, Timothy Ryan ("Ryan").  (Plaintiff's SOF, at ¶ 89).  On January 14, 2013, the plaintiff sent MacNeil a letter stating that Ryan had given her a "mini reprimand" for using the men's bathroom, and had previously used an "exasperated tone of voice" with her in front of students.  (Plaintiff's SOF, at ¶ 89, Ex. R).  According to the plaintiff, MacNeil never acknowledged receipt of this letter. (Plaintiff's SOF, at ¶ 89).  The city contends that Principal MacNeil investigated these concerns shortly after receiving the letter and found no evidence of inappropriate behavior.  (Quincy SOF, at ¶ 49).

On June 29, 2013, the plaintiff reiterated her concerns regarding Ryan in another letter (the "June letter") to Principal MacNeil.  The plaintiff alleges that Ryan glared at her in her classroom, consciously brushed into the plaintiff in an empty hallway, and always looked at her with great disdain.  (Quincy SOF, at ¶ 50, Ex. 28; Plaintiff's SOF, at ¶¶ 90-92).  The plaintiff also raised anew her past issues with Angell, and claimed that she believed MacNeil failed to investigate those concerns, and failed to adhere to the plaintiff's request to keep lines of communication open. (*Id.*)

The plaintiff also raised concerns about her schedule for the next 2012-2013 school year, because her classes were going to be large and have students with mixed grade levels.  The letter also referenced "the on-going overt and subtle discrimination as well as hostility [she] was experiencing" at Atlantic.  (Plaintiff's SOF, at ¶ 94, Ex. S).  In light of her allegations of discrimination and harassment, the city opened an investigation.  (Quincy SOF, at ¶ 52). Mulvey (director of Human Resources) conducted the investigation over the 2013 summer months and

sought to meet with the plaintiff as part of his investigation.  (Quincy SOF, at ¶ 53; Plaintiff's SOF, at ¶ 95).  In response, the plaintiff informed Mulvey that she would be unavailable to meet during the first two weeks of August and was "not sure what more [he] would need from [her] to complete [the] investigation" because she had already provided "an extremely detailed description" of the issues in her June letter.  (Quincy SOF, at ¶ 54, Ex. 31; Plaintiff's SOF, at ¶ 96, Ex. T).

On August 2, 2013, Mulvey emailed the plaintiff for dates and times to meet and discuss her allegations.  (*Id.*)  On the same day, the plaintiff filed another charge with the EEOC in which she reiterated some of the same allegations made in her June letter, and claimed that the city had failed to investigate the same.  (Quincy SOF, at ¶ 54, Ex. 40).

5.  2013-2014 School Year

a.  *Request to Transfer and Continued Failure to Investigate Harassment*

On August 30, 2013, and as the school year was about to begin, the plaintiff sent Mulvey an email asking to switch positions with another teacher named Thai Dang, and transfer to North Quincy High School as an ELL language arts teacher.  (Quincy SOF, at ¶ 56, Ex. 33; Plaintiff's SOF, at ¶ 103).  On September 6, 2013, and before the defendant could respond, the plaintiff emailed her union president that she was no longer "interested in moving schools this far into the year" and to please let Mulvey know that she was "withdrawing [her] request," but was still hoping to discuss the "unresolved issues" she had raised in her June letter.  (Quincy SOF, at ¶ 57, Ex. 34).  The plaintiff tried to arrange a meeting with Principal MacNeil but MacNeil reportedly avoided her.  (Plaintiff's SOF, at ¶ 97).

On September 11, 2013, the plaintiff went out on sick leave because she believed that coworkers were going to mistreat her and "wear [her] down until [she] gave up."  (Plaintiff's SOF,

at ¶ 104; Quincy SOF, at ¶ 58, Ex. 37).  The plaintiff's union president, Allison Cox ("Cox"), met

with MacNeil in the plaintiff's absence and on September 30, 2013 informed the plaintiff that she

and MacNeil had discussed the fact that the plaintiff now had large class sizes and students from

various grades.  (Plaintiff's SOF, at ¶ 97, Ex. U).  Cox informed the plaintiff that MacNeil would

make every effort to ensure that her classes did not have students from mixed grades, and that she

would look into making mid-year adjustments regarding class sizes.  (*Id*.)  Cox did not mention

anything regarding the plaintiff's claims of harassment or the investigation of those claims.

(Plaintiff's SOF, at ¶ 98).

On October 1, 2013, the plaintiff emailed Mulvey.  She indicated that it was clear to her

that MacNeil "[was] not willing to provide any meaningful remedies" in response to the plaintiff's

complaints.  (Quincy SOF, at ¶ 58, Ex. 35).  The plaintiff reiterated her desire to teach ELL

language arts and stated that she felt she had been "plucked out of [her] position of language arts

teacher and forced to take over all the science classes…." (*Id*.)  The plaintiff also complained that

she had not been given a chance to return to ELL language arts even though a newly hired former

tutor was given that opportunity.  (*Id*.)  The plaintiff asked Mulvey to "promptly resolve this entire

situation" as she was being subjected to "an extremely hostile environment."  (Quincy SOF, at ¶

58, Ex. 35; Plaintiff's SOF, at ¶ 103).

The next day, October 2, 2013, the defendant responded to the plaintiff's EEOC charge.

Among other things, the defendant stated that it had investigated the claims made in the plaintiff's

June letter but had not found any evidence of harassment.  (Quincy SOF, at ¶ 55, Ex. 32).  On

October 3, 2013, the plaintiff emailed Mulvey that she was "still out on leave" and that "[p]rior to

returning to work, [she] need[ed] to know exactly what c[ould] be done to remedy the hostile

environment that [she was] continuing to experience while working in the Quincy public schools." (Quincy SOF, at ¶ 58, Ex. 36).

On October 8, 2013, Mulvey sent the plaintiff a letter entitled "Response to October 1 and October 3, 2013 Emails [and] Response to June 29, 2013 Letter of Complaint."  (Quincy SOF, ¶ 59, Ex. 37).  With respect to the June letter, Mulvey directed the plaintiff to the position statement the defendant had submitted to the EEOC noting that, as a result of his investigation, he had found that she was "not subjected to harassment, a hostile work environment, discrimination, or retaliation by [the plaintiff's] coworkers, Principal MacNeil, or anyone else.  In addition, [Mulvey] concluded that no one acted toward [her] inappropriately."  (Quincy SOF, at ¶ 59, Ex. 37).  With respect to the plaintiff's October 1st and October 3rd emails, Mulvey stated that the plaintiff had failed to provide specific information regarding her harassment allegations.  He also asked her to inform him if any new events had transpired that she wanted him to investigate.  (*Id*.)

Approximately one week later, on October 16, 2013, the plaintiff responded to Mulvey. Her response referenced her frustration over her failed attempts to meet with Mulvey in order to discuss the investigation he was conducting as a result of her June letter.  (*Id*.)  In response to Mulvey's inquiry as to whether new discriminatory events had transpired since her June letter, the plaintiff stated:

> Yes, the discriminatory and hostile environment to which I am being subjected is of a continuing nature. The series of events that I reported both in June of 2102 [sic] and 2013 have been either completely disregarded, minimized or falsely characterized as disparate incidents rather than a prolonged pattern of mistreatment meant to force me to quit. In September of this school year, you allowed me to return to school for several days to begin interacting with the same colleagues and supervisor named in my complaint without any feedback whatsoever about your findings. You failed to (at a minimum) take any interim measures to ensure that I knew that the behavior was not going to continue. You disregarded my valid complaint about department scheduling for the 2013/14 school year

11

> and simply reassigned me to it. You provided false, misleading or incomplete information in the Position Statement [to the EEOC] (which will be addressed and documented in a separate Rebuttal Statement) about the incidents related to Ms. MacNeil, Ms. Angell and Mr. Ryan.   You incorrectly concluded that "no one acted inappropriately toward [me]" when, in fact, they did.  And finally, you deny that anyone was working together against me.

(*Id.*)  In addition to alleging continued discrimination, and despite having previously withdrawn her transfer request, the plaintiff also included another request to transfer to North Quincy High School, because "returning to the same worksite would be detrimental to [her] health."  (*Id.*)  The plaintiff "proposed the idea of teaching ELL language arts on a part-time basis in the afternoon [at North Quincy High School], if available," and asked that Mulvey "advise [her] of [his] decision regarding [her] transfer request at [his] earliest opportunity."  (*Id.*)

On October 23, 2013 Mulvey responded that her transfer request had been denied because it was made outside of the bargained-for window regarding transfer requests as set out in the applicable collective bargaining agreement.   He told her that there were no vacancies at North Quincy High School for an ELL teacher at that time.  (Quincy SOF, at ¶ 59, Ex. 37).  Mulvey also referenced the plaintiff's alleged disability and noted that it did not appear a transfer to a different school or a switch to part-time status would be required in order for the plaintiff to perform the essential functions of her job.  (*Id.*)  Instead, Mulvey indicated that if the plaintiff believed that she required accommodations to perform the essential functions of her then-current position at Atlantic, she should submit an accommodation request to him by October 30, 2013.  (*Id.*)

On October 28, 2013, the plaintiff resigned.   The city accepted her resignation the following day.  (Plaintiff's SOF, at ¶ 105, Exs. V and W; Quincy SOF, at ¶ 61, Ex. 38).  In her resignation letter the plaintiff contended that she had been "subjected to a campaign of discrimination, harassment, and retaliation" ever since she began wearing a headscarf to work in

2009.  She claimed that the maltreatment "ha[d] become intolerable and [was] damaging [her] health."  (*Id.*)


II.    **THE COMPLAINT**

The plaintiff filed an initial complaint on March 7, 2014, and an amended ten count complaint on June 27, 2014 (the "complaint").  (Dkt. Nos. 1 and 6).

Count One alleges that the defendant discriminated against the plaintiff on the basis of her religion, in violation of M.G.L. ch. 151B.

Count Two alleges that the defendant discriminated against the plaintiff on the basis of her religion, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e.

Count Three alleges that the defendant retaliated against the plaintiff for complaining of religious discrimination, in violation of M.G.L. ch, 151B.

Count Four alleges that the defendant retaliated against the plaintiff for complaining of religious discrimination, in violation of Title VII.

Count Five alleges that the defendant discriminated against the plaintiff on the basis of her disability, in violation of M.G.L. ch. 151B.

Count Six alleges that the defendant discriminated against the plaintiff on the basis of her disability, in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*

Count Seven alleges that the defendant retaliated against the plaintiff for complaining of disability discrimination, in violation of M.G.L. ch. 151B.

Count Eight alleges that the defendant retaliated against the plaintiff for complaining of disability discrimination, in violation of the ADA.

Count Nine alleges that the defendant constructively discharged the plaintiff in violation of M.G.L. ch. 151B.

Count Ten alleges that the defendant constructively discharged the plaintiff in violation of Title VII.


### III.   STANDARD OF REVIEW

When the Court is presented with a motion for summary judgment, it shall grant it "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003).  Once the moving party meets that burden, in order to avoid summary judgment the opposing party must "'show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation.'" *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (quoting *Ingram v. Brink's, Inc.*, 414 F.3d 222, 228-29 (1st Cir. 2005)).  Indeed, the opposing party must "'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (quoting *Triangle Trading Co. v. Robroy Indus. Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).

When determining whether summary judgment is appropriate, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id.* (citing *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir. 2000)).  Indeed, the Federal Rules require "the entry of summary judgment, after adequate

time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56)).  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (further internal quotation marks omitted).

## IV.   ANALYSIS

### a.   The Discrimination Claims: Counts One, Two, Five and Six

As noted, Counts One and Two allege discrimination on the basis of religion, in violation of Chapter 151B and Title VII, respectively.  Count Five similarly alleges discrimination in violation of Chapter 151B on the basis of a disability, while Count Six alleges disability discrimination on the basis of the ADA.  Chapter 151B and Title VII both proscribe discrimination on the basis of religion in the workplace.  *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 66 (1977).  Similarly, Chapter 151B and the ADA both prohibit an employer from discriminating against an employee on the basis of a disability.  *See Benoit v. Technical Mfg. Corp.*, 331 F.3d 166 (1st Cir. 2003).  As it is the "practice of the Supreme Judicial Court of Massachusetts to apply federal anti-discrimination case law when construing M.G.L. c. 151B," the analysis of state and federal employment discrimination claims follows essentially the same path.  *See Almeder v. Town of Bourne*, 922 F. Supp. 2d 160, 166 (D. Mass. 2013).

A plaintiff alleging employment discrimination on the basis of religion or disability encounters the familiar three-stage, burden-shifting framework laid out in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973); *Sensing v. Outback Steakhouse of Florida*, LLC, 575 F.3d 145, 154 (1st Cir. 2009).  "The plaintiff-employee carries the initial burden to come forward with sufficient evidence to establish a *prima facie* case of discrimination."  *McDonnell Douglas*, 411 U.S. at 802.

In order to establish a *prima facie* case of discrimination, the plaintiff must show that: (1) she is a member of a protected class or, for purposes of her disability claims, suffers from a disability or handicap; (2) she was performing her job at a satisfactory level and was nevertheless able to perform the essential functions of her job with or without reasonable accommodations of her disability; (3) the employer took an adverse employment action against her; and (4) similarly situated employees outside the protected class(es) were treated differently.  *Kosereis v. Rhode Island*, 331 F.3d 207, 212-13 (1st Cir. 2003); *Sensing*, 575 F.3d at 154.  "Such a showing creates a rebuttable presumption that the employer engaged in discrimination."  *Pina v. Children's Place*, 740 F.3d 785, 96 (1st Cir. 2014).

However, "the presumption of discrimination disappears … if the employer is able to articulate a legitimate, non-discriminatory reason for the [adverse employment action.]"  *Id*. (citing *McDonnell Douglas*, 411 U.S. 792).  If the employer does so, "the burden of production returns to the plaintiff, who must offer evidence that the defendant's explanation is pretexual and that discriminatory animus prompted the adverse action." *Id*. (citing *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st Cir.1999)).

Applying those considerations here, there is no meaningful dispute that the plaintiff is Muslim and thus a member of a protected class for purposes of Counts One and Two.  *See e.g., Ahmed v. Johnson,* 752 F.3d 490 (1st Cir. 2014).  The parties also appear to accept that the plaintiff's ADHD brings her within the scope of Counts Five and Six.  *See e.g., Calef v. Gillette*

*Co.,* 322 F.3d 75 (1st Cir. 2003); *Axelrod v. Phillips Academy, Andover,* 36 F.Supp.2d 46 (D. Mass 1999). The defendant argues, though, that the plaintiff cannot prove a *prima facie* case of religious or disability discrimination because she has failed to prove the third prong of a *prima facie* case, that she suffered an adverse employment action. "[A]dverse employment actions" encompass such adverse changes in employment as "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Hernandez Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998). To constitute an adverse employment action, the change in working conditions must be material. *Rafalski v. Donahoe*, No. 10-40060-TSH, 2012 WL 4753274, at *6 (D. Mass. Oct. 3, 2012). Thus, "a transfer or reassignment that involves only minor changes in working conditions normally does not constitute an adverse employment action." *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 23 (1st Cir. 2002). It is not enough that an employee feels "stigmatized and punished" by a reassignment, a more "tangible change in duties or working conditions is needed." *Id.* at 25. Determining whether a change is materially adverse to a plaintiff is done "by an objective standard." *Burns v. Johnson*, 2016 WL 3675157, at *5 (1st Cir. 2016).

Here, the plaintiff characterizes many interactions with school personnel as evidence of discrimination, but she does not in her brief really identify any specific event as constituting an adverse employment action. Rather, she recites a number of factual allegations of mistreatment and then contends, without any greater clarity, that a jury could find "any or all" of them to be adverse. Further muddling this consideration, the plaintiff in most instances fails to state whether some particular action she alleges to be discriminatory was done to her because of her religion or her disability. Nonetheless, the plaintiff does allege that the defendant committed a number of acts which could constitute an adverse employment action, including suspending her for three days in

2010, and changing her teaching assignment such that she was required to learn new subject matter, handle a larger class size, and manage classrooms comprised of students from different grades. *See Booker v. Massachusetts Dep't of Pub. Health,* 527 F.Supp.2d 216, 225 (D. Mass. 2007) (noting that "a suspension without pay" "if not [a] severe example[] of [an] adverse employment action[], sufficiently satisfy[ies] the test); *see also Burns,* 2016 WL 3675157, at *5 (noting that a reassignment with significantly different responsibilities is actionable).  Further, with respect to the plaintiff's disability discrimination claims, an adverse employment action can be established "by a showing that the employer, 'despite knowing of the employee's alleged disability, did not reasonably accommodate it.'"  *Sensing,* 575 F.3d at 157 (citing *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002)).  Here, the plaintiff contends that the city failed to accommodate her requests for a transfer, for clear lines of communication, and for 24 hours' advance notice of meetings.[3]  As the plaintiff alleges that the defendant took these actions against her but not against others, and acknowledging that the initial burden of demonstrating a *prima facie* case of discrimination "is not intended to be onerous," *Sullivan v. Liberty Mut. Ins. Co*., 444 Mass. 34, 45 (2005), the Court finds that the plaintiff has established a *prima facie* case for discrimination on the basis of her religion and disability.

Because the plaintiff has established a *prima facie* case of discrimination, the burden shifts to the city to provide legitimate nondiscriminatory reasons for its actions.  "This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the [plaintiff's] at all times." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991).  The defendant has produced evidence that any actions it took regarding the plaintiff were for nondiscriminatory reasons.

---

[3] The Court takes no position on whether these requests would constitute *reasonable* requests for purposes of the plaintiff's disability claims.

Among other things, there is evidence that the defendant gave the plaintiff a split assignment to accommodate her request to be a full-time teacher, and in so doing gave her the only full-time position then available.  The defendant also produced evidence that other teachers had been given split assignments in the past, that teachers were disciplined in a consistent manner for tardiness issues, and that the plaintiff herself admitted to being tardy.  The defendant also produced evidence that it was entitled under the union contract to require the plaintiff to undergo an IME, and had similarly and previously required the same of other employees.

There was also evidence that it was just not feasible given the way the school operates to accommodate all of the plaintiff's requests, including in particular her request for 24 hours' notice prior to any meeting.  The defendant also produced evidence that it had a legitimate reason for asking the plaintiff to teach ELL science based on a consideration of the needs of the students and the qualifications of the remaining teachers.  The defendant also provided evidence that it denied the plaintiff's transfer request because it was untimely under the union contract and because there was no position available.

Importantly, the defendant produced evidence that it investigated the plaintiff's claims of discrimination and harassment and found no basis to substantiate them.  The plaintiff may not have agreed with the defendant's conclusion but there is no evidence that the city failed to address the plaintiff's concerns or allowed her to be subjected to ongoing discriminatory treatment.  Based on the evidence, then, the city has provided legitimate business reasons to explain its treatment of the plaintiff.

The burden thus shifts back to the plaintiff to show by a preponderance of the evidence that the city's proffered reasons are pretextual and have no reasonable support in the evidence.  *See Wheelock College v. Massachusetts Commission against Discrimination*, 371 Mass. 130, 138

(1976).  The plaintiff cannot make this showing.  To begin, the plaintiff fails to explain why any specific reason proffered by the defendant as legitimate and non-discriminatory should contrarily be seen as pretextual.  Rather, the plaintiff argues in an amorphous fashion that "there is substantial evidence that tends to disprove those reasons," and she reasons that the actions the defendant did take began only after she started wearing a headscarf in 2009.  While temporal proximity is certainly a factor courts consider in determining whether actions taken against a plaintiff were caused at least in part by a forbidden type of bias, it is not a "determinative factor … if there is additional evidence beyond temporal proximity" tending to show that the employer's conduct was not pretextual.  *Chery v. Sears, Roebuck & Co*., 98 F.Supp.3d 179, 197 (D. Mass. 2015).  As noted above, the city has provided evidence that it acted for legitimate business reasons.  Nothing in the plaintiff's opposition provides a basis to call those reasons into question.  As such, there is no evidence from which a jury could decide that the actions taken against the plaintiff were not legitimate or that they were "more probably than not caused by discrimination."  *Burns*, 2016 WL 3675157, at \*6.

In sum, the plaintiff has made a *prima facie* case of religious and disability discrimination but the city has proffered legitimate nondiscriminatory reasons for its treatment of the plaintiff, and there is no evidence in the record that would allow a jury to find by a preponderance of the evidence that those reasons were pretextual.  Summary judgment should therefore be entered in the defendant's favor on Counts One, Two, Five and Six.

b.   The Retaliation Claims:  Counts Three, Four, Seven and Eight

Counts Three and Four allege that the defendant retaliated against the plaintiff for complaining about religious discrimination, in violation of Chapter 151B and Title VII, respectively.  Counts Seven and Eight similarly allege that the defendant retaliated against the

plaintiff for complaining about disability discrimination, in violation of Chapter 151B and the ADA. It is unlawful under any of these statutes for an employer to retaliate against an employee for complaining about discrimination or engaging in a protected activity. *See e.g., Xiaoyan Tang v. Citizens Bank, N.A.,* 821 F.3d 206 (2016) (Chapter 151B and Title VII); *Torres-Alman v. Verizon Wireless Puerto Rico, Inc.,* 522 F.Supp.2d 367 (D. Mass. 2007) (ADA). Claims of retaliation under these statutes also apply the same *McDonnell Douglas* burden-shifting framework outlined above. *Almeder v. Town of Bourne*, 922 F. Supp. 2d 160, 169 (D. Mass. 2013) (Chapter 151B and Title VII); *Salgado-Candelario v. Ericsson Caribbean, Inc.,* 614 F.Supp.2d 151, 178 (D. Puerto Rico 2008) (ADA).

To make a *prima facie* case for retaliation, a plaintiff must show that (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action. *Calero-Cerezo v. U.S. Dept. of Justice,* 355 F.3d 6, 25 (1st Cir. 2004). There are many sources of circumstantial evidence that can demonstrate retaliation. One way is to show a close temporal proximity between the protected conduct and the adverse employment action. *Wyatt v. City of Boston,* 35 F.3d 13, 16 (1st Cir.1994); *see also DeCaire v. Mukasey,* 530 F.3d 1, 19 (1st Cir.2008). Another is to show "[e]vidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action." *Che v. Mass. Bay Transp. Auth.,* 342 F.3d 31, 38 (1st Cir.2003) (citing *Kachmar v. SunGard Data Sys. Inc.,* 109 F.3d 173, 177 (3rd Cir.1997)). This *prima facie* case of retaliation has been described as a "small showing" that is "not onerous" and is "easily made." *Kosereis v. Rhode Island,* 331 F.3d 207, 213 (1st Cir.2003). Once the plaintiff establishes a *prima facie* showing of retaliation, the defendant must under *McDonnell Douglas* articulate a legitimate and non-retaliatory reason for its employment decision. *Id.* If the defendant

does so, the burden shifts to the plaintiff to show that "the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." *Id.*

With regard to the plaintiff's *prima facie* showing, there is no dispute that she engaged in protected activities by filing a charge with the EEOC in January of 2010. This date matters because a retaliation claim is based on conduct that occurs *after* a plaintiff has chosen to engage in protected conduct, and only some of the alleged adverse actions the plaintiff complains of took place after January 2010. These include: (1) the plaintiff's teaching assignments for the 2012-2013 and 2013-2014 school years; (2) the defendant's alleged failure to investigate the plaintiff's claims of harassment; (3) the defendant's denial in 2013 of the plaintiff's request to switch teaching assignments with another teacher; and (4) the defendant's requirement in 2010 that the plaintiff undergo an IME.

Assuming *arguendo* that each of these could constitute an adverse employment action, the plaintiff has failed to produce any real evidence that the defendant took any action against her because she filed an EEOC charge. As the defendant points out, most of these events occurred years after the plaintiff filed her charge. Further, as discussed above, the defendant articulated legitimate business reasons for the teaching assignments it issued to the plaintiff, as well as for denying her request to swap with another teacher. Similarly, the defendant produced evidence that it did investigate her claims of harassment but found no basis to credit them. It is true that the defendant did order the plaintiff to undergo an IME in 2010, relatively close in time to the plaintiff's EEOC filing, but the record shows that the examination was ordered to determine whether the plaintiff was entitled to paid sick leave, and the defendant produced evidence that the defendant had the right under the union contract to require the plaintiff to undergo the IME, and had required other teachers to undergo an IME under similar circumstances. Accordingly, the

defendant has articulated legitimate, non-retaliatory reasons for the actions it took, and the plaintiff has proffered no credible, specific evidence that any action was taken because of the 2010 EEOC charge.

To be sure, the plaintiff argues more generally that the defendant created a hostile work environment after filing her EEOC charge, one so intense that it forced her to resign.  There are three problems with this claim.  First, it is far too amorphous and general to be evaluated, and its premise is in any event belied by the plaintiff's claim elsewhere that the hostile work environment began much earlier in 2009, after she first began wearing a headscarf.  Second, to the extent the plaintiff identifies a particular event as reflective of a hostile work environment, the events tend to involve run-ins with colleagues and peers.  By contrast, there has been no evidence to suggest her colleagues knew of her filing with the EEOC and were harassing her because of it.  There is similarly no evidence that her superiors knew of or were responsible for the actions of her colleagues.  Finally, and most importantly, the only supporting evidence for the plaintiff's claim of a post-EEOC hostile work environment is the plaintiff's own uncorroborated testimony.  Her own conclusory statements, without more, are not entitled to weight at this stage.  *Lewis v. Gillette Co.*, 22 F.3d 22, 25 (1st Cir. 1994) (affirming summary judgment in favor of employer where the only evidence of a causal connection between "gawking" by co-workers and the plaintiff's protected activity was the plaintiff's "personal belief that the gawking was motivated by retaliatory animus.").

In short, there is no evidence that the city retaliated against the plaintiff for complaining about religious or disability discrimination.  For that reason, it is respectfully recommended that judgment be entered in the defendant's favor on Counts Three, Four, Seven and Eight.

c.   The Constructive Discharge Claims:  Counts Nine and Ten

Counts Nine and Ten allege constructive discharge in violation of Chapter 151B and Title VII, respectively.  "A constructive discharge occurs when [an] employer's conduct effectively forces an employee to resign… [and] the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will.  As a result, a constructive discharge is legally regarded as a firing rather than a resignation."  *GTE Products Corp. v. Stewart*, 421 Mass. 22, 33-34 (1995).  "In order to amount to a constructive discharge, adverse working conditions must be unusually aggravated or amount to a continuous pattern before the situation will be deemed intolerable."  *Id*. (citation omitted).  Indeed, "mere dissatisfaction with the nature of assignments, criticism of an employee's performance, and dissatisfaction with compensation have been held insufficient to establish a triable question of fact on the issue of constructive discharge."  *Id*. at 35 (citing *Stetson v. NYNEX Serv. Co*., 995 F.2d 355, 361 (2d Cir. 1993)).   The standard for constructive discharge is viewed from an objective standpoint in that the working conditions must have "been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Id*. at 34 (citing *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977)).

In the present case, and in light of the foregoing, the Court finds no basis to conclude that the plaintiff's working conditions were so intolerable that a reasonable person would have felt compelled to resign.  The plaintiff was not facing a demotion or loss of job responsibilities, or a reduction in her compensation.  On the contrary, she was working full-time, at one school, just as she had requested.  The plaintiff contends that remaining in this position would have forced her to endure "hostile, insulting and dismissive treatment" but the Court has already concluded that there is no evidence to support her characterization of the workplace as hostile, and rejects this claim.

24

*See Suarez v. Pueblo Intern., Inc.*, 229 F.3d 49, 54 (1st Cir. 2000) (noting that the standard for a constructive discharge claim "cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held.").   Moreover, the city has produced evidence of letter and email exchanges with the plaintiff leading up to the date of her resignation.   The exchanges tend to show that the defendant remained ready to investigate any perceived harassment against the plaintiff, and to accommodate any reasonable requests in relation to her disability.   On these facts, the plaintiff simply cannot meet her burden of demonstrating that she was constructively discharged.   *See Hall v. FMR Corp.,* 667 F.Supp.2d 185, 202 (D. Mass. 2009) (plaintiff must "offer evidence of harassment at least as severe (if not more) than that required for a hostile work environment claim" in order to prevail on constructive discharge claim).   Judgement should therefore enter in the defendant's favor on Counts Nine and Ten.


**V.     CONCLUSION**

For the foregoing reasons, it is respectfully recommended that the motion for summary judgment be GRANTED (Dkt. No. 60).   The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.   The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.   The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b), will preclude further appellate review of the District Court's order based on this Report and Recommendation.   *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1st Cir.

1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466 (1985).

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  September 1, 2016